FILED
2017 Dec-07 AM 09:50
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION
No. 7:17-cv-01961-LSC

| | | |
|---|---|---|
| MARIAN SNOW | ) | |
| | ) | |
| Plaintiff, | ) | FIRST AMENDED |
| vs. | ) | COMPLAINT |
| | ) | |
| GENERAL ELECTRIC COMPANY, | ) | |
| DELL TECHNOLOGIES, DELL INC., | ) | JURY TRIAL DEMAND |
| DELL EMC, and DOES 1-5 | ) | |
| | ) | |
| Defendants. | ) | |

Now comes Plaintiff, Marian Snow, and pursuant to the Federal Rules of Civil Procedure Rule 15(a)(1)(A), hereby amends, as a matter of course, her Complaint (DE 1).

## NATURE OF ACTION

1. This is an action under the Telephone Consumer Protection Act ("TCPA") 47 U.S.C. § 227.

## JURISDICTION AND VENUE

2. This Court has jurisdiction under 47 U.S.C. § 227(b)(3), 28 U.S.C. § 1331, and 28 U.S.C. § 1367(a)).

3. Venue is proper before this Court pursuant to 28 U.S.C. § 1391(b), where the acts and transactions giving rise to Plaintiff's action occurred in this district, where Plaintiff resides in this district, or where Defendant(s) transact business in this district.

4. Under 28 U.S.C. § 1658(a), the statute of limitations for violations of 47 U.S.C. § 227 is four years from the date of the violation; and under §6-2-34(3), Ala.Code 1975 the statute of limitations governing conversion claims in Alabama is six years of their accrual; and, therefore,

the subject action is well within these limitations.

## PARTIES

5. Plaintiff Marian Snow ("Plaintiff") is a natural person who resides in the State of Alabama, County of Tuscaloosa, and City of Tuscaloosa.

6. Defendant General Electric Company ("GE") is a New York corporation headquartered in Boston, Massachusetts.

7. Defendant Dell EMC ("EMC") is a Delaware corporation headquartered in Hopkinton, Massachusetts.

8. Defendants Dell Technologies, Inc. ("Dell Tech") and Dell, Inc. ("Dell") are Delaware corporations headquartered in Round Rock, Texas.

9. Defendants Does 1-5 are yet to be identified and named.

10. Hereafter, Defendants, themselves, their agents, their affiliates and their subsidiaries will be referenced collectively ("Defendants").

## FACTUAL ALLEGATIONS

11. At no relevant time did Plaintiff have a prior established business relationship with Defendants per the meaning given the term in section 64.1200 of title 47, Code of Federal Regulations, as in effect on January 1, 2003.

12. On March 29, 2014, Plaintiff purchased a new cellular telephone provided by the service, Tracfone, who assigned a telephone number ending in 4908 ("Plaintiff's cell phone").

13. Plaintiff activated her new cell phone, which had been purchased along with an airtime or prepaid minutes package from said service, Tracfone, within a short time thereafter.

14. At some unknown time, prior to or around April 1, 2014, Defendants caused or facilitated the composition, programming, system implementation, and automated or automatic transmission or sending through any of multiple technologies or business applications, including

2
Case 5:18-cv-00511-FL   Document 4   Filed 12/06/17   Page 2 of 17

Internet-to-phone messaging technologies, text calls, or short message service ("SMS") calls ("Defendants' text messages") to the subject Plaintiff's cell phone number ending in 4908.

15. Defendants took the actions necessary to initiate a communication with Plaintiff through use of her telephone number by an automated means that did not require direct human intervention and which resulted in the receipt of text messages by Plaintiff's cell phone.

16. Between April 1, 2014 and January 15, 2015, Defendants' text messages, as received by Plaintiff's cell phone, numbered in the thousands.

17. Within one single 24-hour period, the number of Defendants' text message batches sent to Plaintiff's cell phone equaled or exceeded thirty-nine (39).

18. In one or more instances, Defendants' text message batches were relentlessly transmitted to Plaintiff's cell phone at a startling rate of seven (7) or more within a single minute.

19. Defendants did not possess Plaintiff's prior express consent to send any text messages to Plaintiff.

20. At no time did Plaintiff expressly request any texts or solicit information from Defendants or from their agents, affiliates or subsidiaries to be sent to Plaintiff's cell phone.

21. Defendants voluntarily chose to take or not take, to omit, or to avoid the steps that caused Defendants' text messages to be sent.

22. Plaintiff's cellular telephone is an LG model 840G that illuminates, hums and vibrates each time an incoming text message is received.

23. Each unsolicited text message that Defendants transmitted to Plaintiff's cell phone invaded Plaintiff's privacy and intruded upon Plaintiff's solitude and seclusion upon receipt.

24. Each unsolicited text message that Defendant transmitted to Plaintiff's cell phone distracted and aggravated Plaintiff upon receipt.

25. Upon receiving each of Defendant's text messages, Plaintiff wasted valuable time

interacting with her cellular device in order to access the message, and then wasted more valuable time viewing the message and ultimately disposing of the text message.

26. Each of Defendants text messages transmitted to Plaintiff's cellular device detained, interfered with and impermissibly used available data storage on Plaintiff's cell phone, and thus reduced the overall data storage capacity of Plaintiff's cell phone.

27. Defendants' text messages transmitted to Plaintiff's cell phone: 1) detained or commandeered; 2) interfered with; and 3) used or misused her personal private property.

28. Defendants' text messages received were often so profuse so as to result in the production of alerts on Plaintiff's cell phone advising that her mailbox was filled, such as:

**"86 New Messages. Text message box over 100% full."** and

**"Text message box full. Delete old messages."**

29. Defendants' text messages took authority over Plaintiff's cell phone text message memory and interfered with Plaintiff's ability to receive other text messages.

30. Receipt of Defendants' text messages diminished the available battery power (and shortened the battery life) of her personal property on receipt of the subject text messages.

31. Receipt of Defendants' text messages required Plaintiff to expend energy (i.e., electricity) to recoup the battery power lost as a result of receiving the subject messages.

32. The number that was displayed in the "FROM" address in Defendants' text messages was 10-digits long. ("Sender ID").

33. Defendants text message sent on April 30, 2014 at 7:16am displayed a Sender ID of "1210100022" and another that was received that day at 9:37am displaying a Sender ID of "1210100025".

34. Defendants text message received by Plaintiff's cell phone on August 19, 2014 at 5:04am displayed a Sender ID of "1210100270".

4

35. Upon information and good faith belief, the Sender IDs appeared to be sequential and to change or increase by one digit with each text message Plaintiff's cell phone received.

36. Upon information and good faith belief, a Sender ID, such as those sent to Plaintiff's cell phone, may also be known as a long number, a virtual mobile number, a dedicated phone number or a long code, and should display the sender's pre-approved US sender number.

37. Upon information and good faith belief, concatenated SMS, multipart or segmented SMS, or long SMS messages are sent using multiple messages, in which case each message will start with a User Data Header ("UDH") containing segmentation information.

38. Defendants' text messages, as received by Plaintiff's cell phone, were delivered as a batch of five (5) text messages, the first holding the Sender ID followed by a UDH, in this manner: "FROM 1210100265 --- 1 of 5".

39. The four (4) successive separate Defendants' text messages, sent in the batch of five (5), usually carried a UDH, such as "2 of 5", "3 of 5", "4 of 5", or "5 of 5".

40. Each batch of Defendants' text messages received by Plaintiff's cell phone deducted charges for five (5) separate texts from her prepaid minutes.

41. Upon information and good faith belief, a single SMS text message has a maximum payload size of 1120 bits, and when sent to or received by a cellular telephone that supports Latin-based alphabet languages, like English, has a maximum capacity of 160 characters, based on Global System for Mobile Communications (GSM) network protocol character encoding of 7 bits per character.

42. Upon information and good faith belief, due to the limitations of using a text message platform, Defendants' communications to Plaintiff's cell phone, in the form of Defendants' text messages, each carried a unique Sender ID and was delivered a batch of five (5) distinct and enumerated text messages.

43. Based upon the sequential Sender IDs and the UDHs displayed in Defendants' text messages, each of which was sequential, the number of text messages Defendants sent to Plaintiff's cell phone exceeded two-thousand nine-hundred 2900 during the subject time period.

44. On May 4, 2014 at 8:19pm, Plaintiff's cell phone received seven (7) unique and date-branded Defendants' text message batches within one single minute.

45. Within said single minute at 8:19pm on May 4, 2014, Plaintiff's cell phone had, in fact, been deluged with thirty-five (35) separate text messages and with injuries of 35 accompanying text message charges thereafter deducted from Plaintiff's prepaid minutes.

46. On September 24, 2014, a day when Defendants' text message batches sent to Plaintiff's cell phone numbered thirty-nine (39) or more within 24-hours, Defendants inflicted Plaintiff's cell phone with no less than one-hundred ninety-five (195) text messages and injury for no less than a resulting 195 text message charges, thereafter.

47. The content of Defendants' text messages contained technical information or alerts that were clearly intended for another recipient.

48. The technical information or alerts contained in Defendants' text messages included, but were not limited to: "FRM:EMC Control Center @e2ksmtp01.e2k.ad.ge.com"; "SUBJ:ECC Alert: SRDF/A"; "Session entered transmit idle state"; "Alert ID: 1854732"; "Severity: NORMAL"; "Severity: WARNING"; Server Timestamp: Mon Aug 25 02:19:14 BST 2014"; "Alert Name: PC Communications Error"; "Canonical Managed Object Name: Symmetrix=00287890995"; "stent.symmetrix.Symmetrix,38380"; "NAME: Storage Agent"; and "gislonpecesym.gis.corp.gc.com".

49. It is Plaintiff's good faith belief that she was, for a period of over nine (9) months, the unwitting recipient of a barrage of communications intended for the prior owner or holder of her reassigned number.

50. A call or text message intended for an internal business or industrial communication, or as a remote alert to an employee(s) or agent(s), can be sent to a reassigned number and potentially reach a member of the public.

51. A call or text message intended for an internal business or industrial communication, or as an remote alert to an employee(s) or agent(s), can be sent to an incorrectly entered or generated number and potentially reach a member of the public.

52. Upon information and good faith belief, and in light of the frequency, number, nature, and character of Defendants' text messages, Defendants utilized one or more of the forms of hardware, software, or equipment that the FCC characterizes as an automatic telephone dialing system through the following, and any related, reports and orders, and declaratory rulings: *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 17 FCC Rcd 17459, 17474 (September 18, 2002); *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 FCC Rcd 14014, 14092-93 (July 3, 2003); *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 23 FCC Rcd 559, 566 (Jan. 4, 2008); *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, FCC 14-32 (adopted March 27, 2014 and released March 27, 2014).

53. Defendants initiated communications with Plaintiff through use of her telephone number by an automated means that did not require direct human intervention.

54. Defendants' text messages omitted, or failed to provide, an interactive "opt-out" mechanism or any means for Plaintiff to ask that they stop.

55. Defendants' text messages were sent in such a manner as to block or disallow replies, leaving Plaintiff powerless to reply, object, or ask that they stop.

56. Defendants' text messages omitted, or failed to identify, a working telephone number

of the sender, or to provide contact information to allow communication with the sender.

57. The content of Defendants' text messages displayed or made reference to: "EMC Control Center", "Symmetrix" and "SRDF".

58. Upon information and good-faith belief, Defendant GE is the owner of the URL or web address: "ge.com", which was referenced in Defendants' text messages.

59. Upon information and good-faith belief, Defendant EMC owns the registered trademarks for "EMC", Symmetrix" and "SRDF" in the United States and other countries.

60. Upon information and good-faith belief, Defendants Dell, Dell Tech or EMC, themselves, or by and through their agents, affiliates, predecessors, or subsidiaries, created, developed, produced or produce a technology product called EMC Symmetrix or Symmetrix.

61. Upon information and good-faith belief, the website for Defendant EMC offers training for both: "DELL EMC Symmetrix" and "SRDF".

62. As of November 15, 2017, the Dell Technologies website (at https://www.delltechnologies.com/en-us/press/dell-technologies-announces-multi-year-agreement-with-ge.htm) displayed a news release which stated: "**ROUND ROCK, TEXAS | Sept. 7, 2017** – Dell Technologies announces that GE, the world's largest digital industrial company, has signed a multi-year commitment to use Dell Inc. infrastructure and end-user computing solutions to support GE's ongoing digital transformation efforts. Under the agreement, Dell Inc. becomes the primary IT infrastructure supplier for GE. The deal is one of the largest non-government contracts in Dell Technologies, Dell or EMC history."

63. As of November 15, 2017, the Dell Tech website (delltechnologics.com) also states:

> "Dell Technologies is so committed to driving customer success we've combined the power of seven leaders to do it: Dell, Dell EMC, Pivotal, RSA, SecureWorks, Virtustream, and VMware. Individually and together, we enable true digital transformation and deliver game-changing advantages."

64. The Dell Tech website quotes "Michael Dell, chairman and CEO, Dell

8

Technologies", as saying: "Dell Technologies is uniquely positioned to provide customers like GE with the essential building blocks to transform their IT and realize the digital future. We are excited to deepen our relationship with GE to enable them to better serve customers and to continue our mutual exploration of what's possible for the industrial internet". [sic]

65. The Dell Tech website quotes "Chris Drumgoole, vice president and chief technology officer, digital technology at GE", stating: "GE's collaboration with Dell Technologies has helped us drive the transformation of GE into a digital industrial company. The investment we are making today will continue to push us forward and improve the end-user experience for our employees around the globe."

66. Upon information and good faith belief, Mr. Dell's quote that Dell was excited "to deepen our relationship with GE" implies that Dell and GE had an ongoing relationship that predated the 2017 multi-year commitment announced.

67. Upon information and good faith belief, Mr. Drumgoole's said quote, "has helped us," further supports the implication that Dell and GE had a prior collaborative relationship.

68. The Dell Tech website boasts that Dell Tech provides essential infrastructure to 98 percent of the Fortune 500, and based upon reading this statement, Plaintiff formed a belief that the company possesses great influence, and correspondingly, great responsibility.

69. In the 2014 GE Annual Report CEO Letter, (https://www.ge.com/ar2014/ceo-letter) Jeffrey R. Immelt, Chairman of the Board and Chief Financial Officer, states the following:

> "Sometimes companies play it safe, defend the status quo or manage momentum. Not GE. We have the ambition to lead the next generation of industrial progress. So we have been profoundly changing our company."[] "GE has a lean structure. Our administrative cost is [] below most of our peers. We run the Company with small headquarters, common processes and shared services." [] "STAY LEAN TO GO FAST. Scarcity drives teamwork, will and accountability."

70. Defendant GE's CEO, therefore, admitted in the Annual Report for the very year in which the Defendants inflicted damages and harm upon Plaintiff, that GE: does not "play it

9

safe"; has been "profoundly changing"; has a "lean structure"; confessed that its spending on administrative costs was "below most of our peers"; and that GE believes "scarcity drives teamwork".

71. Defendants GE, Dell, Dell Tech and EMC, being large, experienced and diverse companies, possessed knowledge of the statutes that prohibit the automated sending of communications to cellular telephone numbers without express consent of their recipient(s).

72. Defendants knew it was possible that a recipient who had provided their prior express consent to receive Defendants' text messages could abandon, in some fashion, the cellular telephone number for which they had express consent to contact.

73. Defendants knew it was possible that the telephone number for intended recipient of Defendants' text messages could be incorrectly entered into their automated system as other than the number for which they had express consent to contact.

74. Defendants acted to create text messages, implement systems, program software or facilitate the sending Defendants' text messages while knowing of the possibility of a reassigned or incorrect number(s) and of the injury that would likely or probably result from said actions or inactions if their multitude of text messages were sent to an unintended recipient.

75. Defendants failed to take the precautionary measures to have in place or implement established, maintained and diligently-enforced policies, best practices, safeguards or controls for determining whether a telephone number to which they were transmitting was proper or whether it was truly a number for which they had express consent to contact.

76. Defendants failed to take the precautionary measures to have in place or implement established, maintained and diligently-enforced policies, best practices, safeguards or controls for determining when a telephone number was not, or was no longer, in the control of their intended recipient.

77. Defendants failed take the precautionary measures to have in place or implement established, maintained and diligently-enforced policies, best practices, safeguards or controls to avoid automatically sending communications to, or robo-texting, an unintended recipient.

78. Defendants knew there existed a high degree of probability of causing substantial harm to unintended recipients

79. Defendants failed to have in place or implement an interactive mechanism to allow an unintended recipient of a reassigned number to notify Defendants and opt-out of receiving texts.

80. Defendants consciously, knowingly or intentionally disregarded the rights of others when Defendants either omitted or failed to provide their agents, employees or affiliates proper and diligently implemented training addressing the risks and potential consequences of possible unintended results, such as those inflicted upon Plaintiff.

81. Defendants consciously, knowingly or intentionally disregarded the rights of others when Defendants either omitted or failed to provide their agents, employees or affiliates proper and diligently implemented instruction in conscientious or respectful stewardship of their products or services.

82. Defendants displayed conscious or intentional disregard of an unreasonable risk, knowing that said risk entailed a high degree of probability of causing substantial harm to others.

83. Defendants' subject actions, inactions, or omissions, as described in this complaint, inflicted: incessant disturbance and annoyance upon Plaintiff; persistent awakening and interruption of her sleep; loss of her valuable time; loss of her financial resources; commandeering of data storage and battery life of her equipment; and fatigue, anguish and suffering upon Plaintiff.

84. Defendants irresponsibly hired, retained, contracted with, affiliated with, or failed to properly train, employees, contingent workers, agents, affiliates, and any other persons acting on

behalf of or in affiliation with Defendants, who were allowed to act inflicting harm to Plaintiff.

85. Defendants' subject actions, inactions, or omissions exhibited knowing, willing or reckless disregard of the rights and interests of Plaintiff.

86. Defendants knowingly, willingly or consciously took the steps necessary to create or to transmit messages that omitted, or failed to provide, an interactive "opt-out" mechanism.

87. Defendants knowingly, willingly or consciously took the steps necessary to create or to transmit messages that omitted, or failed to identify, a telephone number or contact information to facilitate communication with sender.

88. Defendants knowingly, willingly or consciously took the steps necessary to create or to deliver text messages in such a method as to block the recipient's ability to reply to Defendants' text messages.

89. Defendants knew they had engaged in the conduct necessary to program software, or to implement technology or equipment, to cause Defendants' text messages to be sent.

90. Defendants, by their own free will, engaged in conduct, which caused Defendants' text messages to be transmitted or sent.

91. Defendants consciously omitted their duty to have in place or implement established diligently implemented policies, safeguards or controls regarding proper stewardship of their product(s) while knowing of the possibility of a reassigned number(s) or of the injury that would likely or probably result from said omission.

92. Defendants consciously omitted their duty to do appropriate training of best practices while knowing of the possibility of a reassigned number(s) or of the injury that would likely or probably result from said omission.

93. It is Plaintiff's contention and belief that Defendants were aware of the prohibitions of the TCPA and knew that the statute did not provide for the recovery of attorneys' fees.

94. It is Plaintiff's contention and belief that Defendants: 1) thought that recipient victims would likely not be aware of the TCPA; 2) believed it was unlikely that recipient victims would have the financial means to hire an attorney to pursue the remedies offered by the TCPA; 3) believed the resulting number of recipient victims would remain small enough as to avoid the risk of class action; or 4) believed recipient victims would not have the fortitude to take on the massive effort necessary to pursue the private right of action afforded by the TCPA as a *pro se* plaintiff.

95. It is Plaintiff's contention and belief that Defendants weighed the costs of implementing due diligence to track incorrect or reassigned numbers, and acted with scienter, making the conscious financial decision to ignore their duties to train properly or to have in place or implement established policies, best practices, safeguards or controls that would avoid the infliction of oppressive conduct and the resulting damage perpetrated upon unintended recipient victims in the manner in which their robo-texting was oppressively and egregiously inflicted upon Plaintiff.

96. Defendants intended to engage in the conduct that caused Defendants' text messages to be transmitted or sent.

97. Defendants intentional actions, inactions, or omissions interfered with Plaintiff's interest in solitude, by either physical or nonphysical means, in her seclusion and in her privacy.

98. Prior to the sending of Defendants' text messages, Defendants failed to take reasonable steps to discover any reassignment of the subject wireless number ending in 4908.

99. Defendants, under the doctrine of *respondeat superior*, possess liability for the acts, the omissions, or the lack of training of Defendants' agents who, within the line and scope of their agency relationship with their principal(s), caused the subject contacts and attempted contacts with Plaintiff.

13

100. The Dell Tech website (at delltechnologies.com) publishes a document entitled *How We Win: Dell Technologies Code of Conduct*, which makes the statements: "We believe in being accountable" and "We believe that being a responsible corporate citizen".

101. Defendants sent no text messages to Plaintiff's cell phone for emergency purposes.

102. Plaintiff has retained photographic evidence of Defendants' text messages, as received by Plaintiff's cell phone.

103. Based upon the Sender IDs displayed in Defendants' text messages, each of which was sequential, the number of text messages Defendants sent to Plaintiff's cell phone exceeded 2900 during the subject time period.

104. Upon information and good-faith belief, Defendants maintain business records that document the actual quantity and detail of all Defendants' text messages attempted, transmitted, or sent to Plaintiff's cell during the subject time period, including the associated Sender IDs.

## COUNT I.
## VIOLATION OF 47 U.S.C. § 227(b)(1)(A)(iii)

105. Plaintiff repeats and re-alleges each and every factual allegation contained in paragraphs 11 – 104.

106. Defendants violated 47 U.S.C. § 227(b)(1)(A)(iii) by willfully and knowingly making a non-emergency call to any telephone number assigned to a cellular service, using an automatic telephone dialing system, sent to Plaintiff's cell phone absent Plaintiff's prior express consent.

## COUNT II.
## WRONGFUL CONVERSION OF PERSONAL PROPERTY

107. Plaintiff repeats and re-alleges each and every factual allegation contained in paragraphs 11 – 104.

108. Alabama law recognizes Plaintiff's right to retain full use and possession of her own personal property; and, in the course of violating 47 U.S.C. § 227(b)(1)(A)(iii), Defendants committed wrongful detention and unwarranted interference with Plaintiff's property and illegally commandeered, used or misused her personal property.

109. Defendant acted in derogation of Plaintiff's possessory rights, unfairly assumed authority, and wrongly exerted dominion over, Plaintiff's personal property.

110. Through the sending of text messages, often in voluminous quantities, to Plaintiff's cell phone, Defendants seized and converted for their own use: 1) Plaintiff's cell phone equipment; 2) Plaintiff's cell phone text message memory; 3) Plaintiff's cell phone battery life; and on multiple occasions, 4) the ability of Plaintiff's cell phone to receive other text messages.

111. Defendants, based upon clear and convincing evidence, committed multiple acts of wrongful conversion of Plaintiff's personal property, pursuant to Alabama Code § 6-11-20(4).

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

a) Finding and adjudging that Defendants violated 47 U.S.C. § 227(b)(1)(A)(iii);

b) Enjoining Defendants from continuing their violative behavior toward Plaintiff and others, pursuant to 47 U.S.C. § 227(b)(3)(A);

c) Finding and adjudging liability, through the doctrine of *respondeat superior*, upon Defendants for any actions, inactions or omissions of any agents, affiliates, employees or associates of Defendants, which violated 47 U.S.C. § 227(b)(1)(A)(iii);

d) Awarding Plaintiff actual damages, or statutory damages in the amount of $500.00 for each such violation of 47 U.S.C. § 227(b)(1)(A)(iii), whichever is greater, pursuant to 47 U.S.C. § 227(b)(3)(B);

e) Finding and adjudging that Defendants willfully or knowingly acted in violation of 47 U.S.C. § 227(b)(1)(A)(iii) and treble the damage award, pursuant to 47 U.S.C. § 227(b)(3), in the amount of $1,500.00 for each such violation, or three times Plaintiff's actual damages, whichever is greater;

f) Finding and adjudging that Defendants committed multiple acts of wrongful conversion, based on clear and convincing evidence, pursuant to Alabama Code § 6-11-20(4), in a compensatory amount to be determined at trial, and thereafter awarding punitive damages, pursuant § 6-11-21(a), in the amount of $500,000.00 or three times the compensatory damages awarded herewith to Plaintiff, whichever is greater;

g) Finding and adjudging the placement of liability, through the doctrine of *respondeat superior,* upon Defendants for any actions, inactions or omissions of any agents, affiliates, employees or associates of Defendants for multiple acts of wrongful conversion in a compensatory amount to be determined at trial, and thereafter, awarding punitive damages pursuant to Alabama Code § 6-11-21(a), in the amount of $500,000.00 or three times the compensatory damages awarded herewith to Plaintiff, whichever is greater;

h) Awarding Plaintiff reasonable attorneys' fees, costs, and expenses under Rule 23 of the Federal Rules of Civil Procedure;

i) Awarding Plaintiff any pre-judgment and post-judgment interest as may be allowed under the law;

j) Awarding other and further relief as the Court may deem just and proper.

## TRIAL BY JURY

Plaintiff is entitled to and hereby demands a trial by jury.

## CERTIFICATION AND CLOSING

Under Rule 11 of the Federal Rules of Civil Procedure, by signing below, I certify to the best of my knowledge, information, and belief that this complaint; (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a non-frivolous argument for extending, modifying or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) complies with the requirements of Rule 11.

Dated: December 6, 2017

*Marian Snow*
Marian Snow
4336 Ridgewood Road
Tuscaloosa, AL 35404
(919) 449-4908
msnow20@gmail.com