IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:18-CV-511-FL

| | |
|---|---|
| MARIAN SNOW, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | ORDER |
| ) | |
| GENERAL ELECTRIC COMPANY, ) | |
| DELL TECHNOLOGIES, DELL INC., ) | |
| and DELL EMC, ) | |
| ) | |
| Defendants. ) | |

This matter is before the court on defendants' motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) (DE 65, 68). Plaintiff responded in opposition and defendants replied. In this posture, the issues raised are ripe for ruling. For the following reasons, defendants' motions are granted.

**STATEMENT OF THE CASE**

Plaintiff commenced this action pro se on November 21, 2017, in the United States District Court for the Northern District of Alabama, and filed amended complaint on December 6, 2017, asserting claims arising out of unwanted text messages she received on her cell phone, for violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227(b)(1)(A)(iii), and for conversion under state law. Plaintiff seeks statutory damages in the amount of $500.00 for each violation of the TCPA, trebled to $1,500.00 for each violation; compensatory damages and punitive damages for conversion; injunctive and declaratory relief; as well as fees, costs, and interest.

The United States District Court for the Northern District of Alabama dismissed plaintiff's action for lack of personal jurisdiction over defendants and transferred the action to this district for all further proceedings, on October 29, 2018. This court set a deadline for filing responsive pleading and set aside previous scheduling order entered by the United States District Court for the Northern District of Alabama.

Defendant General Electric Company ("GE") filed its instant motion to dismiss for failure to state a claim on December 7, 2018, relying upon a May 14, 2018, public notice by the United States Federal Communications Commission ("FCC"), and an October 3, 2018, public notice by the FCC. Defendants Dell EMC, Dell Inc., and Dell Technologies (collectively, the "Dell defendants") filed their instant motion to dismiss for failure to state a claim on December 10, 2018. Plaintiff responded in opposition to each motion to dismiss on January 23, 2019. Defendant GE replied on February 6, 2019, and the Dell defendants replied on February 7, 2019.

## STATEMENT OF ALLEGED FACTS

The facts alleged in the complaint[1] may be summarized as follows.

Plaintiff is a resident of Tuscaloosa, Alabama. Defendants GE and Dell EMC are corporations headquartered in Massachusetts, and defendants Dell Technologies, Inc. and Dell, Inc. are corporations headquartered in Texas. According to the complaint, defendant GE is "the world's largest digital industrial company," and the Dell defendants "provide[] essential [technological] infrastructure to 98 percent of the Fortune 500." (Compl. ¶¶ 62, 68).

"On March 29, 2014, [p]laintiff purchased a new cellular telephone provided by the service Tracfone, who assigned a telephone number ending in 4908 ('[p]laintiffs cell phone')." (Compl.

---

[1] All references to the "complaint" or "Compl." in citations are to the amended complaint filed December 6, 2017 (DE 4), unless otherwise specified.

¶ 12). "Plaintiff activated her new cell phone, which had been purchased along with an airtime or prepaid minutes package from said service, Tracfone, within a short time thereafter." (Id. ¶ 13).

"At some unknown time, prior to or around April 1,2014, [d]efendants caused or facilitated the composition, programming, system implementation, and automated or automatic transmission or sending through any of multiple technologies or business applications, including Internet-to-phone messaging technologies, text calls, or short message service ('SMS') calls ('[d]efendants' text messages') to the subject [p]laintiff's cell phone number ending in 4908." (Id. ¶ 14). "Defendants took the actions necessary to initiate a communication with [p]laintiff through use of her telephone number by an automated means that did not require direct human intervention and which resulted in the receipt of text messages by [p]laintiff's cell phone." (Id. ¶ 15).

Between April 1, 2014, and January 15, 2015, defendants sent in excess of 2900 text messages to plaintiff's cell phone. (Id. ¶ 43). "The content of [d]efendants' text messages contained technical information or alerts that were clearly intended for another recipient." (Id. ¶ 44). "It is [p]laintiff's good faith belief that she was, for [that] period[,] . . . the unwitting recipient of a barrage of communications intended for the prior owner or holder of her reassigned number." (Id. ¶ 49). According to plaintiff, a "text message intended for an internal business or industrial communication, or as a remote alert to an employee[] or agent[], can be sent to a reassigned number" or "an incorrectly entered or generated number" and "potentially reach a member of the public." (Id. ¶¶ 51-52).

"The technical information or alerts contained in [d]efendants' text messages included, but were not limited to: 'FRM:EMC Control Center@e2ksmtpOLe2k.ad.ge.com'; 'SUBJ:ECC Alert: SRDF/A'; 'Session entered transmit idle state'; 'Alert ID: 1854732'; 'Severity: NORMAL';

3

'Severity: WARNING'; 'Server Timestamp: Mon Aug 25 02:19:14 BST 2014'; 'Alert Name: PC Communications Error'; 'Canonical Managed Object Name: Symmetrix=00287890995': 'stent.symmetrix.Symmetrix,38380'; 'NAME: Storage Agent'; and 'gislonpeccsym.gis.corp.ge.com'." (Id. ¶ 48).

According to plaintiff, defendant GE is "the owner of the URL or web address: 'ge.com', which was referenced in [d]efendants' text messages." (Id. ¶ 58). Defendant Dell EMC allegedly produces and "owns the registered trademarks for 'EMC', 'Symmetrix', and 'SRDF,'" as also referenced in defendants' text messages. (Id. ¶¶ 59-61). According to plaintiff, based upon her research, the Dell defendants and GE had an ongoing technology or collaborative relationship during the period of time she received text messages from defendants. (See id. ¶¶ 62-67).

"The number that was displayed in the 'FROM' address in [d]efendants' text messages was 10-digits long. ('Sender ID')." (Id. ¶ 32). "Defendants' text message sent on April 30, 2014 at 7:16am displayed a Sender ID of '1210100022' and another that was received that day at 9:37am display[ed] a Sender ID of '1210100025'." (Id. ¶ 33). Another received August 19, 2014, "displayed a Sender ID of '1210100270'." (Id. ¶ 34). "[T]he Sender IDs appeared to be sequential and to change or increase by one digit with each text message [p]laintiffs' cell phone received." (Id. ¶ 35).

According to plaintiff, "long SMS messages are sent using multiple messages, in which case each message will start with a User Data Header ("UDH") containing segmentation information." (Id. ¶ 37). "Defendants' text messages, as received by [p]laintiff's cell phone, were delivered as a batch of five . . . text messages, the first holding the Sender ID followed by a UDH, in this manner: 'FROM 1210100265 — 1 of 5'." (Id. ¶ 38). "The four . . . successive separate [d]efendants' text

4

messages, sent in the batch of five . . . , usually carried a UDH, such as '2 of 5', '3 of 5', '4 of 5', or '5 of 5'." (Id. ¶ 39).

"On May 4, 2014 at 8:19pm, [p]laintiff's cell phone received seven . . . unique and date-branded [d]efendants' text message batches within one single minute." (Id. ¶ 44). "Within said single minute at 8:19pm on May 4, 2014, Plaintiffs cell phone had, in fact, been deluged with [35] separate text messages[.]" (Id. ¶ 45). "On September 24, 2014, a day when [d]efendants' text message batches sent to [p]laintiff's cell phone numbered [39] or more within 24-hours, [d]efendants inflicted [p]laintiff's cell phone with no less than [195] text messages[.]" (Id. ¶ 46).

"Each batch of [d]efendants' text messages received by Plaintiff's cell phone deducted charges for five . . . separate texts from her prepaid minutes." (Id. ¶ 40). For example, texts received on May 4, 2014, resulted in 35 text message charges, and texts received on September 24, 2014, resulted in 195 text message charges. (See id. ¶¶ 45-46).

"Defendants' text messages omitted, or failed to provide, an interactive 'opt-out' mechanism or any means for [p]laintiff to ask that they stop." (Id. ¶ 54). "Defendants' text messages were sent in such a manner as to block or disallow replies, leaving [p]laintiff powerless," through such means, "to reply, object, or ask that they stop." (Id. ¶ 55). "Defendants' text messages omitted, or failed to identify, a working telephone number of the sender, or to provide contact information to allow communication with the sender." (Id. ¶ 56).

"Defendants did not possess [p]laintiff's prior express consent to send any text messages to [p]laintiff." (Id. ¶ 19). "At no time did [p]laintiff expressly request any texts or solicit information from [d]efendants or from their agents, affiliates or subsidiaries to be sent to [p]laintiff's cell phone." (Id. ¶ 20). "Plaintiff's [cell phone] . . . illuminates, hums and vibrates each time an incoming text

5

message is received." (Id. ¶ 22). "Each unsolicited text message that [d]efendants transmitted to [p]laintiff's cell phone invaded [p]laintiff's privacy and intruded upon [p]laintiff's solitude and seclusion" and "distracted and aggravated [p]laintiff upon receipt." (Id. ¶¶ 23-24).

"Upon receiving each of [d]efendant's text messages, [p]laintiff wasted valuable time interacting with her cellular device in order to access the message, and then wasted more valuable time viewing the message and ultimately disposing of the text message." (Id. ¶ 25). Each such text message "detained, interfered with[,] and . . . used available data storage on [p]laintiff's cell phone, and thus reduced the overall data storage capacity on [p]laintiff's cell phone." (Id. ¶ 26). "Defendants' text messages received were often so profuse so as to result in the production of alerts on [p]laintiff's cell phone advising that her mailbox was filled," thus interfering "with [p]laintiff's ability to receive other text messages," "diminish[ing] the available batter power (and shorten[ing] the battery life)," and "requir[ing] [p]laintiff to expend energy (i.e. electricity) to recoup the battery power lost." (Id. ¶¶ 28-31).

## COURT'S DISCUSSION

A.     Standard of Review

"To survive a motion to dismiss" under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "Factual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. In evaluating whether a claim is stated, "[the] court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff," but does not consider "legal conclusions, elements of a cause of action, . . . bare assertions devoid of further factual

enhancement[,] . . . unwarranted inferences, unreasonable conclusions, or arguments." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009) (citations omitted).

B.  Analysis

   1.  TCPA

"Congress enacted the . . . TCPA to prevent abusive telephone marketing practices." Krakauer v. Dish Network, L.L.C., ___ F.3d ___, ___ 2019 WL 2292196, at *1 (4th Cir. 2019). In pertinent part, the TCPA prohibits any person from making "any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any <u>automatic telephone dialing system</u> . . . to any telephone number assigned to a . . . cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii) (emphasis added). An "automatic telephone dialing system" ("ATDS") is defined as "equipment which has the capacity - - (A) to store or produce telephone numbers to be called, <u>using a random or sequential number generator</u>; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1) (emphasis added).

Plaintiff's TCPA claim fails as a matter of law because plaintiff does not allege that the text messages[2] she received were sent using equipment which has the capacity to store or produce numbers to be called using a random or sequential number generator. Plaintiff asserts in conclusory terms in the complaint that defendants "utilized one or more of the forms of hardware, software, or equipment that the FCC characterizes as an automatic telephone dialing system." (Compl. ¶ 52). She asserts that defendants communicated to plaintiff "by an automated means that did not require human intervention." (Id. ¶ 54). However, such "recitals of the elements of a cause of action, supported by

---

   [2]  Defendants do not dispute that, although the statute refers only to "calls," the term encompasses text messages at issue here, as other courts also have presumed. See, e.g., Dominguez on Behalf of Himself v. Yahoo, Inc., 894 F.3d 116, 118 n.3 (3d Cir. 2018)

7

mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678. A "formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555.

Critically missing from the complaint are any facts permitting an inference that the text messages plaintiff received were sent using equipment that stores or produces numbers to be called "using a random or sequential number generator." 47 U.S.C. § 227(a)(1) (emphasis added). Indeed, the facts alleged suggest the opposite. Plaintiff alleges that the text messages did not reach her randomly, but rather reached her because she was assigned a telephone number previously assigned to an individual who received technical alerts as a part of a job function. (See, e.g, Compl. ¶¶ 44-52).

For example, plaintiff alleges "[t]he content of [d]efendants' text messages contained technical information or alerts that were clearly intended for another recipient." (Id. ¶ 44) (emphasis added). She states she was "the unwitting recipient of a barrage of communications intended for the prior owner or holder of her reassigned number." (Id. ¶ 49) (emphasis added). According to plaintiff, a "text message intended for an internal business or industrial communication, or as a remote alert to an employee[] or agent[], can be sent to a reassigned number" or "an incorrectly entered or generated number" and "potentially reach a member of the public." (Id. ¶¶ 51-52) (emphasis added). It is also notable that the messages comprised highly technical alerts and messages, with no intelligible marketing content and no "interactive 'opt-out' mechanism or any means for Plaintiff to ask that they stop." (Compl. ¶¶ 48, 54-55, 57). Because plaintiff alleges that the text messages she received were intended for the prior owner or holder of her reassigned number, a targeted recipient, and because of the alleged content of the messages, it is not reasonable to infer that the messages were sent with equipment "using a random or sequential number generator." 47 U.S.C. § 227(a)(1).

8

Plaintiff argues that it is sufficient as a matter of law to allege that defendants used equipment that has the capacity "to store telephone numbers and dial such numbers," even where the dialing system "never had the capacity to produce or store telephone numbers using a random or sequential number generator." (Pl's Mem. (DE 75) at 8-9) (quotations omitted). According to plaintiff, the defining characteristic of an ATDS is "the capacity to dial numbers without human intervention." (Id. at 9) (quotations omitted). Plaintiff advances, however, a standard for defining an ATDS that does not take into account the "random or sequential number generator" element in the statute. 47 U.S.C. § 227(a)(1).

Plaintiff cites to prior decisions by this court where the court expressed the standard for defining an ATDS in the manner plaintiff asserts here. In Danehy v. Jaffe & Asher, LLP, No. 5:14-CV-60-FL, 2015 WL 1249879, at *9 (E.D.N.C. Mar. 17, 2015), the court stated in dicta that an ATDS "means equipment that has the capacity to store telephone numbers and dial such numbers." Id. (emphasis added). In Cartrette v. Time Warner Cable, Inc., 157 F. Supp. 3d 448, 457 (E.D.N.C. 2016), the court rejected the argument that a "lack of a random or sequential number generator removes it from the definition of ATDS," relying instead upon "FCC Guidance" for the proposition "that the definition of ATDS includes dialing equipment that has the capacity to store and dial numbers from a preprogrammed list without human intervention." Id. (emphasis added).

Recently, however, in ACA International v. Federal Communications Commission, 885 F.3d 687, 691 (D.C. Cir. 2018) the D.C. Circuit invalidated a 2015 FCC order defining ATDS in the manner advanced by this court in Danehy and Cartrette. In so doing, the D.C. Circuit held that "numbers that are 'randomly or sequentially generated' differ from numbers that 'come from a calling list.'" Id. at 702. The D.C. Circuit rejected the FCCs interpretations that "a device can be considered

9

an autodialer even if it has no capacity itself to generate random or sequential numbers." Id. It further determined "unreasonab[le]," the FCC's "expansive understanding of when a device has the 'capacity' to perform the necessary functions." Id.

Accordingly, this court's reliance on FCC guidance in Cartrette and the court's similar interpretation in Danehy are no longer good law, because that guidance has been invalidated. Although the Fourth Circuit has not addressed the impact of ACA International on prior FCC interpretations of the definition of ATDS, other circuits uniformly have held that ACA International set aside the FCC's interpretations of the definition of an ATDS, and that the court must return to interpreting the statutory definition of ATDS without that FCC guidance. See, e.g., Marks v. Crunch San Diego, LLC, 904 F.3d 1041, 1049 (9th Cir. 2018) ("Because the D.C. Circuit exercised its authority to set aside the FCC's interpretations of the definition of an ATDS in the 2015 order and any prior FCC rules that were reinstated by the 2015 order, we conclude that the FCC's prior orders on that issue are no longer binding on us."); King v. Time Warner Cable Inc., 894 F.3d 473, 477 (2d Cir. 2018) ("ACA International . . . invalidated [the 2015 FCC Order] and thereby removed any deference we might owe to the views the FCC expressed in it."); Dominguez on Behalf of Himself v. Yahoo, Inc., 894 F.3d 116, 119 (3d Cir. 2018) (recognizing that ACA International "set aside" the 2015 FCC Order, and that "[i]n light of the D.C. Circuit's holding, we interpret the statutory definition of an autodialer as we did prior to the issuance of" the 2015 FCC Order).

Plaintiff suggests that ACA International does not alter a prior 2003 FCC interpretation of the ATDS definition under which it concluded that an ATDS need only have "the capacity to dial numbers without human intervention." (Pl's Resp. (DE 75) at 9) (quotations omitted). The D.C.

10

Circuit, however, expressly drew a connection between the FCC's 2003 interpretation of ATDS and the FCC's 2015 interpretation:

> [I]n the 2003 order, the Commission had made clear that, while some predictive dialers cannot be programmed to generate random or sequential phone numbers, they still satisfy the statutory definition of an ATDS. 2003 Order, 18 FCC Rcd. at 14,091 ¶ 131 n.432; id. at 14,093 ¶ 133. By reaffirming that conclusion in its 2015 ruling, the Commission supported the notion that a device can be considered an autodialer even if it has no capacity itself to generate random or sequential numbers (and instead can only dial from an externally supplied set of numbers).

ACA Int'l, 885 F.3d at 702 (emphasis added). The D.C. Circuit also described the impact of its review on both the 2015 order and prior orders of the FCC, stating: "[T]he Commission's latest ruling purports to reaffirm the prior orders," and "that does not shield the agency's pertinent pronouncements from review," where "[t]he agency's prior rulings left significant uncertainty about the precise functions an autodialer must have the capacity to perform." Id. at 701.

Plaintiff also suggests that, even without FCC guidance, this court should interpret the definition of ATDS to encompass any equipment that has the capacity to store and dial numbers from a preprogrammed list, even without the capacity to store or produce numbers to be called "using a random or sequential number generator." 47 U.S.C. § 227(a)(1) (emphasis added). Plaintiff urges the court to follow the Ninth Circuit's interpretation in Marks v. Crunch San Diego, LLC, 904 F.3d 1041, 1050 (9th Cir. 2018). There, the court determined that the TCPA was "ambiguous on its face," and held that "the statutory definition of ATDS is not limited to devices with the capacity to call numbers produced by a 'random or sequential number generator,' but also includes devices with the capacity to dial stored numbers automatically." Id. at 1052.

A significant number of courts have rejected the reasoning of Marks, however, and the Third Circuit adopted a contrary approach in Dominguez on Behalf of Himself v. Yahoo, Inc., 894 F.3d

11

116, 121 (3d Cir. 2018), in requiring that a calling system "function[] as an autodialer by randomly or sequentially generating telephone numbers, and dialing those numbers." Id.; see, e.g., Thompson-Harbach v. USAA Fed. Sav. Bank, 359 F. Supp. 3d 606, 626 (N.D. Iowa 2019) ("[T]his Court finds the Marks court's decision erroneous as a matter of statutory construction."); Johnson v. Yahoo!, Inc., 346 F. Supp. 3d 1159, 1162 (N.D. Ill. 2018) (rejecting Marks, and holding the statute is "not ambiguous"); Roark v. Credit One Bank, N.A., No. CV 16-173 (PAM/ECW), 2018 WL 5921652, at *3 (D. Minn. Nov. 13, 2018) (rejecting Marks and requiring a "present capability to generate random or sequential numbers to dial" to qualify as an ATDS).

Although the Fourth Circuit and courts within this circuit have not addressed the split between these courts and Marks, the court finds the Dominguez approach better comports with the plain language of the statue. The statute unambiguously incorporates a "random or sequential number generator" into the definition of an ATDS. 47 U.S.C. § 227(a)(1). Thus, plaintiff must allege facts permitting an inference that defendants called her with equipment that has the capacity to store or produce numbers using a random or sequential number generator.

Finally, plaintiff argues that, even if she must allege equipment using a random or sequential number generator, she has alleged sufficient facts to meet this standard. However, as discussed above, plaintiff's own allegations foreclose a determination that defendants called her with equipment using a random or sequential number generator. (See, e.g., Compl. ¶¶ 47-57). The plain language and purpose of the TCPA does not support allowing claims to proceed under such alleged circumstances.

In sum, plaintiff's TCPA claim fails as a matter of law and must be dismissed. Because the court determines that plaintiff's claims must be dismissed due to failure to allege use of an ATDS, and this determination turns largely on a question of statutory interpretation, the court does not reach

12

Case 5:18-cv-00511-FL   Document 80   Filed 06/14/19   Page 12 of 14

additional grounds for dismissal raised by defendants that turn on other deficiencies in plaintiff's pleadings.

2. Dismissal With Prejudice

"[T]he nature of dismissal is a matter for the discretion of the district court." Adbul-Mumit v. Alexandria Hyundai, LLC, 896 F.3d 278, 292 (4th Cir. 2018); see Carter v. Norfolk Cmty. Hosp. Ass'n, Inc., 761 F.2d 970, 974 (4th Cir. 1985) ("[D]ismissal under Rule 12(b)(6) is . . . with prejudice unless [the court] specifically orders dismissal without prejudice. That determination is within the district court's discretion."). In exercising this discretion, the court is not required to "resolve pleading deficiencies, regardless of previous opportunities to amend or other extenuating circumstances." Adbul-Mumit, 896 F.3d at 292.

In this case, dismissal of the TCPA claim with prejudice is warranted in light of the fact that plaintiff's TCPA claim turns largely upon an issue of statutory interpretation for which there is a split in the courts, and where the Fourth Circuit has not addressed the issue of law presented. In addition, plaintiff has alleged facts that foreclose proceeding under the interpretation of the statute advanced by defendants. Therefore, it is unlikely that amendment of the complaint consistent with the allegations already made could salvage plaintiff's claim in light of the law as interpreted herein. Accordingly, the court dismisses plaintiff's TCPA claim with prejudice.

3. State Law Claim

The court "may decline to exercise supplemental jurisdiction" over a state law claim included in an action on the basis of supplemental jurisdiction under 28 U.S.C. § 1367(a), if

> (1) the claim raises a novel or complex issue of State law,
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

13

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C.A. § 1367(c). Here, plaintiff asserts a claim of conversion, citing Alabama law. (See Compl. ¶¶ 107-111). Where the court has dismissed with prejudice the only claim over which it has original jurisdiction, and where plaintiff's state law claim raises novel issues of law, including choice of law and the standard for pleading conversion in the context of intangible property interests, the court in its discretion declines to exercise supplemental jurisdiction over this claim.

Plaintiff's state law claim thus is dismissed without prejudice pursuant to 28 U.S.C. § 1367.

## CONCLUSION

Based on the foregoing, defendants' motions to dismiss (DE 65, 68) are GRANTED. Plaintiff's claim under the TCPA is DISMISSED WITH PREJUDICE. Plaintiff's state law claim of conversion is DISMISSED WITHOUT PREJUDICE pursuant to 28 U.S.C. § 1367. The clerk is DIRECTED to close this case.

SO ORDERED, this the 14th day of June, 2019.

_____
LOUISE W. FLANAGAN
United States District Judge